**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**BOWLING GREEN DIVISION**

| | |
|---|---|
| JAMIAHIA KENNEDY, WILLOW NEAL, CHANCHIZ BROWN, D.B. (a minor child), and C.C.(a minor child) on Behalf of Themselves Individually and All Others Similarly Situated | ) ) ) ) ) ) ) |
| PLAINTIFFS | ) ) |
| v. | ) ) CIVIL ACTION NO 1:24-cv-00016-GNS |
| | ) ) |
| KENTUCKY DEPARTMENT OF JUVENILE JUSTICE | ) ) |
| SERVE: Russell Coleman, Attorney General ServetheCommonwealth@ky.gov | ) ) ) ) ) ) |
| and | ) ) |
| ADAIR COUNTY YOUTH DETENTION CENTER | ) ) ) |
| SERVE: Russell Coleman, Attorney General ServetheCommonwealth@ky.gov | ) ) ) ) |
| And | ) ) |
| CAMPBELL REGIONAL JUVENILE DETENTION CENTER | ) ) ) |
| SERVE: Russell Coleman, Attorney General ServetheCommonwealth@ky.gov | ) ) ) ) |
| And | ) ) ) |
| FAYETTE REGIONAL JUVENILE DETENTION CENTER | ) ) |

1

SERVE:                                          )
    Russell Coleman, Attorney General              )
    ServetheCommonwealth@ky.gov                    )
                                                   )
                                                   )
KENTUCKY CABINET FOR HEALTH AND                 )
FAMILY SERVICES                                 )
                                                   )
SERVE:                                          )
    Russell Coleman, Attorney General              )
    ServetheCommonwealth@ky.gov                    )
                                                   )
KENTUCKY JUSTICE AND PUBLIC                     )
SAFETY CABINET                                  )
                                                   )
SERVE:                                          )
    Russell Coleman, Attorney General              )
    ServetheCommonwealth@ky.gov                    )
                                                   )
                                                   )
and                                             )
                                                   )
KERRY HARVEY, Individually and in his           )
capacity as former Secretary                    )
of the Kentucky Justice                         )
and Public Safety Cabinet                       )
125 Holmes Street                               )
Frankfort, KY 40601                             )
                                                   )
KEITH JACKSON, Individually and in his          )
official capacity as Secretary of the           )
Justice and Public Safety Cabinet               )
SERVE:                                          )
    Russell Coleman, Attorney General              )
    ServetheCommonwealth@ky.gov                    )
                                                   )
and                                             )
                                                   )
VICKI REED, Individually and in her official    )
Capacity as former Commissioner                 )
of the Department of Juvenile Justice           )
1025 Capital Center Drive, 3rd Floor            )
Frankfort, KY 40601                             )
                                                   )
and                                             )
                                                   )

RANDY WHITE, Individually and in his            )
official capacity as                            )
Commissioner Department of Juvenile Justice     )
SERVE:                                          )
    Russell Coleman, Attorney General      )
    ServetheCommonwealth@ky.gov            )
                                                )
and                                             )
                                                )
GEORGE SCOTT, Individually and in his           )
Official capacity as                            )
Executive Director Office of                    )
Program Operations Services                     )
1025 Capital Center Drive, 3rd Floor            )
    Frankfort, KY 40601                    )
                                                )
and                                             )
                                                )
JAMES SWEATT, II, Individually and in his       )
Official capacity as Executive Director,        )
Office of Detention,                            )
Department of Juvenile Justice                  )
1025 Capital Center Drive, 3rd Floor            )
    Frankfort, KY 40601                    )
                                                )
and                                             )
                                                )
DAVID KAZEE, Individually and in his            )
official capacity as Division Director          )
1025 Capital Center Drive, 3rd Floor            )
    Frankfort, KY 40601                    )
                                                )
and                                             )
                                                )
TONYA BURTON, Individually and in her           )
official capacity as Superintendent             )
of Adair County Youth Detention Center          )
401 Appleby Drive                               )
Columbia, KY 42728                              )
                                                )
and                                             )
                                                )
CHRISTOPHER RAKES, Individually and in          )
his official capacity as Juvenile Facility      )
Superintendent of Adair County                  )
Youth Detention Center                          )

401 Appleby Drive                                        )
Columbia, KY 42728                                       )
                                                         )
and                                                      )
                                                         )
TOM MILBURN, Individually and in his                     )
official capacity as Superintendent of the               )
Campbell Regional Juvenile Detention Center              )
590 Columbia Street                                      )
Newport, KY 41071                                        )
                                                         )
and                                                      )
                                                         )
JOE CASKEY, Individually and in his official             )
capacity as Superintendent of the                        )
Fayette Regional Juvenile Detention Center               )
3475 Spurr Road                                          )
Lexington, KY 40511                                      )
                                                         )
    DEFENDANTS                                           )

## FIRST AMENDED COMPLAINT

### INTRODUCTION

1.  Plaintiffs file this action to address constitutional and statutory deficiencies within Kentucky's juvenile facilities. This is a longstanding problem, having first come up during the Clinton administration.

2.  It most recently resurfaced due to abuse and neglect in the Adair County Youth Detention Center on a scale so unconscionable that it led to intervention by the General Assembly.

3.  Plaintiff Jamiahia Kennedy files this action in her individual capacity and on behalf of all children held in the Adair and Campbell Regional Juvenile Detention Centers.

4.  Plaintiff Willow Neal files this action in her individual capacity and on behalf of all children held in the Adair Regional Juvenile Detention Center.

5.  Plaintiff Chanchiz Brown files this action in his individual capacity and on behalf of all

children held in the Adair and Fayette Regional Juvenile Detention Centers.

6.  Plaintiff D.B. is a minor child who files this action in their individual capacity and on behalf of all children held in the Adair County Youth Detention Center.

7.  Plaintiff C.C. is a minor child who files this action in their individual capacity and on behalf of all children held in the Adair County Youth Detention Center.

8.  Plaintiffs jointly file this action on behalf of all children incarcerated by the Department of Juvenile Justice ("DJJ"), at any location, who were subjected to policies and practices as described in the class definitions herein.

9.  Defendants' conduct violates clearly established, longstanding, national (and international) standards for detaining and incarcerating adults, much less children.

10. Defendants' treatment of Plaintiffs and other class members is intolerable in a civilized society. In fact, the children were subjected to conditions that violate the Geneva Convention and the Uniform Code of Military Justice.

11. Defendants engaged in the conduct described below under color of the law of the Commonwealth of Kentucky.

12. Defendants' conduct was intentional or grossly negligent, or indicated active malice toward Plaintiffs and the class, or constitutes a total and reckless disregard for and indifference to Plaintiffs' constitutional rights, justifying an award of punitive damages in addition to the actual damages which Plaintiffs and the class are entitled to recover.

13. Defendants enacted or perpetuated policies and practices that resulted in the Plaintiffs' and class members' injuries.

14. Such treatment has been regularly perpetrated by Defendants and there are potentially thousands of members of the class and subclasses.

15. There are questions of law and fact in this case that are common to all members of the class.

16. Plaintiffs' claims are typical of those of the class, and they will fairly and adequately protect the interests of this class.

## JURISDICTION AND VENUE

17. Plaintiffs and all others similarly situated seek declaratory and injunctive relief, and all available monetary damages from Defendants under the Civil Rights Act of 1871, 42 U.S.C. §1983, for gross and unconscionable violations of the rights, privileges, and immunities guaranteed them by the Fourth, Eighth, and Fourteenth Amendments to the Constitution of the United States.

18. This Court has jurisdiction over these claims pursuant to the provisions of 28 U.S.C. §1331 and §1343.

19. Jurisdiction over Plaintiffs' state law claims is conferred upon this Court by 28 U.S.C. §1367, which provides supplemental jurisdiction over state law claims so related to federal law claims that one case or controversy exists for Article III purposes.

20. Many of the constitutional deprivations alleged below were committed within the jurisdiction of the United States District Court for the Western District of Kentucky, Bowling Green Division. Venue in this District is proper pursuant to 28 U.S.C. §1391.

## CLASS ACTION

21. Plaintiffs bring this action as a class action pursuant to Rules 23(b)(1), (2) and (3) of the Federal Rules of Civil Procedure.

## THE CLASS AND/OR SUBCLASSES

22. The Class or sub-Classes consist of all individuals incarcerated by DJJ who were:

a. Involuntarily held alone in a cell, room, or other area as punishment;

b. Involuntarily held alone in a cell, room, or other area for any reason other than posing an immediate safety threat or due to a medical necessity;

c. Involuntarily held alone in a cell, room, or other area due to suicide risk but not provided mental health intervention during or after the isolation period;

d. Subjected to the use of chemical agents, pepper spray, or tasers;

e. Deprived of access to education;

f. Deprived of access to personal hygiene, including showers, toiletries, and menstrual products;

g. Denied access to medical and mental healthcare;

h. Subjected to strip searches or had clothes forcibly removed by or within view of members of the opposite sex; and

i. Denied access to dental care.

23. Plaintiffs and other members of the class were subjected to such treatment despite the absence of any legitimate penological interest or probable cause.

24. Plaintiffs will fairly and adequately protect the interests of all class members. They are members of the class, and their claims are typical of the claims of all class members.

25. Plaintiffs were harmed and de-humanized by the treatment accorded them and will aggressively pursue the interests of the entire class.

26. Plaintiffs' interest in obtaining injunctive relief and actual and punitive damages for the violations of their constitutional rights and privileges are consistent with and not antagonistic of those of any other person within the class.

27. Defendants regularly hold children in isolation, deprive them of educational instruction, deprive them of access to medical and mental healthcare, deprive them of basic hygiene and showers, and withhold prescribed medications.

28. Defendants regularly exposed girls' naked bodies to members of the opposite sex, either

through conducting the forcible removal of clothing or withholding clothing while in view of employees and other detainees.

29. Such abuses violate the Fourth, Eighth, and Fourteenth Amendments to the Constitution of the United States, 42 U.S.C. §1983, and clearly established law.

30. Plaintiffs and the members of the class are entitled to declaratory and injunctive relief and an award of compensatory and punitive damages.

31. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

    a)    A multiplicity of suits with consequent burden on the courts and Defendants should be avoided.

    b)    It would be virtually impossible for all class members to intervene as parties-plaintiffs in this action.

    c)    Upon adjudication of Defendants' liability, claims of the class members can be determined by this Court.

## PARTIES

32. Plaintiff Jamiahia Kennedy ("Kennedy") is a resident of the Commonwealth of Kentucky and was held in the Adair County Youth Detention Center from approximately August 30, 2022 to December 13, 2022. Kennedy was held in the Campbell County Regional Juvenile Detention Center from approximately December 2022 to October 2023.

33. Plaintiff Willow Neal ("Neal") is a resident of the Commonwealth of Kentucky and was held in the Adair County Youth Detention Center in 2022.

34. Plaintiff Chanchiz Brown ("Brown") is a resident of the Commonwealth of Kentucky and was held in the Fayette County Regional Juvenile Detention Center from approximately September 2021 to September 2022. Brown was held in the Adair County Youth Detention Center from approximately September 2022 to December 2023.

35.  Plaintiff D.B. is a minor child and resident of the Commonwealth of Kentucky. D.B. was held in the Adair County Youth Detention Center from approximately November 2022 to July 2023.

36. Plaintiff C.C. is a minor child and resident of the Commonwealth of Kentucky. C.C. was held in the Adair County Youth Detention Center from approximately December 14, 2023 to March 31, 2024, and is currently in the custody of DJJ.

37. Defendant Kentucky Department of Juvenile Justice ("DJJ") is responsible for the conditions of confinement in youth detention facilities, for the establishment of policies either formally or by custom and practice, and for the employment, training, supervision, and conduct of the officers and employees of Kentucky's youth detention facilities.

38. The Detention Centers are charged with the care, custody, and supervision of incarcerated youth.

39. Defendant Justice and Public Safety Cabinet is a government entity established by KRS § 15A.020. The Cabinet is comprised of five departments, one of which is the DJJ. KRS § 15A.020(1)(c).

40. Cabinet for Health and Family Services ("CHFS") is charged with the care, custody, and supervision of children in Kentucky's foster-care system.

41. Defendant Kerry Harvey ("Harvey") was the Secretary of the Kentucky Justice and Public Safety Cabinet during portions of Plaintiffs' confinement. Harvey was responsible for the conditions of confinement in youth detention facilities, for the establishment and implementation of policies either formally or by custom and practice, and for the employment, training, supervision and conduct of the officers and employees of Kentucky's youth detention facilities. Harvey is named in his individual and official capacities.

42. Defendant Keith Jackson ("Jackson") is the Secretary of the Kentucky Justice and Public Safety Cabinet and is responsible for the conditions of confinement in youth detention facilities, for the establishment and implementation of policies either formally or by custom and practice, and for the employment, training, supervision and conduct of the officers and employees of Kentucky's youth detention facilities. Jackson is named in his individual and official capacities.

43. Defendant Vicki Reed ("Reed") was Commissioner of the Department of Juvenile Justice during portions of Plaintiffs' detentions. Reed was responsible for the conditions of confinement in youth detention facilities, for the establishment and implementation of policies either formally or by custom and practice, and for the employment, training, supervision and conduct of the officers and employees of Kentucky's youth detention facilities. Reed is named in her individual and official capacities.

44. Defendant Randy White ("White") is Commissioner of the Department of Juvenile Justice and is responsible for the conditions of confinement in youth detention facilities, for the establishment and implementation of policies either formally or by custom and practice, and for the employment, training, supervision and conduct of the officers and employees of Kentucky's youth detention facilities. White is named in his individual and official capacities.

45. Defendant Marshay Boyd ("Boyd") is Division Director, Compliance Division of the Department of Juvenile Justice and is responsible for the conditions of confinement in youth detention facilities, for the establishment and implementation of policies either formally or by custom and practice, and for the employment, training, supervision and conduct of the officers and employees of Kentucky's youth detention facilities. Boyd is named in her individual and official capacities.

46. Defendant Elzie Burgher ("Burgher") is Executive Director, Office of Support Services

of the Department of Juvenile Justice and is responsible for the conditions of confinement in youth detention facilities, for the establishment and implementation of policies either formally or by custom and practice, and for the employment, training, supervision and conduct of the officers and employees of Kentucky's youth detention facilities. Burgher is named in his individual and official capacities.

47. Defendant George Scott ("Scott") was Executive Director of Office of Program Operations Services in the Department of Juvenile Justice during portions of Plaintiffs' incarceration. Scott was responsible for the conditions of confinement in youth detention facilities, for the establishment and implementation of policies either formally or by custom and practice, and for the employment, training, supervision and conduct of the officers and employees of Kentucky's youth detention facilities. Scott is named in his individual and official capacities.

48. Defendant Dena Burton ("Burton") is Executive Director Office of Operations in the Department of Juvenile Justice and is responsible for the conditions of confinement in youth detention facilities, for the establishment and implementation of policies either formally or by custom and practice, and for the employment, training, supervision and conduct of the officers and employees of Kentucky's youth detention facilities. Burton is named in her individual and official capacities.

49. Defendant James Sweatt, II ("Sweatt") is Executive Director, Office of Detention in the Department of Juvenile Justice and is responsible for the conditions of confinement in youth detention facilities, for the establishment and implementation of policies either formally or by custom and practice, and for the employment, training, supervision and conduct of the officers and employees of Kentucky's youth detention facilities. Sweatt is named in his individual and

official capacities.

50. Defendant David Kazee ("Kazee") was Division Director, Office of Detention in the Department of Juvenile Justice during portions of Plaintiffs' confinement. Kazee was responsible for the conditions of confinement in youth detention facilities, for the establishment and implementation of policies either formally or by custom and practice, and for the employment, training, supervision and conduct of the officers and employees of Kentucky's youth detention facilities. Kazee is named in his individual and official capacities.

51. Tonya Burton ("Burton") is the Superintendent of the Adair County Youth Detention Center and is responsible for the care, custody, and supervision of youth at the Detention center, the conditions of confinement in the Detention Center, for the establishment and implementation of policies either formally or by custom and practice, and for the employment, training, supervision and conduct of its officers and employees. Burton is named in her individual and official capacities.

52. Christopher Rakes ("Rakes") is the Juvenile Facility Superintendent of the Adair County Youth Detention Center and is responsible for the care, custody, and supervision of youth at the Detention Center, the conditions of confinement in the Detention Center, for the establishment and implementation of policies either formally or by custom and practice, and for the employment, training, supervision and conduct of its officers and employees. Rakes is named in his individual and official capacities.

53. Tom Milburn ("Milburn") is the Superintendent of the Campbell Regional Juvenile Detention Center and is responsible for the care, custody, and supervision of youth at the Detention center, the conditions of confinement in the Detention Center, for the establishment and implementation of policies either formally or by custom and practice, and for the

employment, training, supervision and conduct of its officers and employees. Milburn is named in his individual and official capacities.

54. Joe Caskey ("Caskey") is the Superintendent of the Fayette Regional Juvenile Detention Center and is responsible for the care, custody, and supervision of youth at the Detention center, the conditions of confinement in the Detention Center, for the establishment and implementation of policies either formally or by custom and practice, and for the employment, training, supervision and conduct of its officers and employees. Caskey is named in his individual and official capacities.

## FACTUAL ALLEGATIONS
### Kentucky Department of Juvenile Justice

55. The Justice and Public Safety Cabinet is a government entity established by KRS § 15A.020. The Cabinet is comprised of five departments, one of which is the Department of Juvenile Justice ("DJJ"). KRS § 15A.020(1)(c).

56. In 1995, the Civil Rights Division of the United States Justice Department ("DOJ") investigated Kentucky's juvenile residential programs.[1]

57. The DOJ found that found that "all of the facilities failed to meet the constitutional and statutory rights of juveniles as required in the Civil Rights of Institutionalized Persons Act."[2]

58. The specific areas of concern included "abuse of juveniles through an overuse of isolation and a lack of timely investigation of staff abuse of juveniles; poor education programs; poor mental health programs; inadequate medical services; poor aftercare and community

---

[1] Exhibit 1; U.S. Department of Justice, *Reforming of Juvenile Justice in Kentucky: A Report on the Commonwealth of Kentucky's Effort to Address a Federal Consent Decree of Juvenile Services,* Abstract, (2001); accessible online at https://www.ojp.gov/ncjrs/virtual-library/abstracts/reforming-juvenile-justice-kentucky-report-commonwealth-kentuckys
[2] *Id.*

follow-up; and inadequate staffing ratios and training."[3]

59. In December 1995, then Governor Brereton Jones signed a consent decree requiring

Kentucky to take steps to make significant improvements to its juvenile justice system.

60. Specifically, the consent decree included the following requirements:

a. "Immediately cease using isolation and time-out for punishment or the convenience of staff."[4]

b. "Defendants shall place juveniles in isolation only when such a placement meets specified treatment goals or is necessary for immediate and short-term security."[5]

c. "Defendants shall ensure that an adequate number of qualified and experienced teachers" are available to provide educational and vocation services.[6]

d. "In no event shall Defendants use mace or other chemical agents on the juveniles."[7]

e. "Defendants shall ensure that there is adequate staff at each juvenile treatment facility…"[8]

f. "Defendants shall hire and maintain sufficient numbers of juvenile counseling positions to adequately implement juvenile treatment programs, including performing individual and group counseling as required in each resident's individual treatment program."[9]

g. "The Defendants shall ensure that current and new treatment center staff members are sufficiently well-trained and competency-based tested." This training "shall entail, at minimum, training and testing" in areas such as "adolescents and adolescent development; crisis intervention, de-escalation of conflict situations, handling anger, []dispute resolution," among many others.

h. Ensure that juveniles have access to immediate and adequate healthcare.[10]

i. Ensure that juveniles have access to mental health services as well as routine

---

[3] *Id.*
[4] Exhibit 2 – Consent Decree at 8; accessible online at  https://clearinghouse-umich-production.s3.amazonaws.com/media/doc/1488.pdf
[5] *Id.*
[6] *Id.* at 6
[7] *Id.* at 5
[8] *Id.* at 9
[9] *Id.*
[10] *Id.* at 9-10

screening.[11]

61. In order to comply with the consent decree, the General Assembly passed HB 117, creating the DJJ.[12] The DJJ is charged with developing and administering programs for:

a.  Prevention of juvenile crime;

b.  Identification of juveniles at risk of becoming status or public offenders and development of early intervention strategies for these children, and, except for adjudicated youth, participation in prevention programs shall be voluntary;

c.  Providing educational information to law enforcement, prosecution, victims, defense attorneys, the courts, the educational community, and the public concerning juvenile crime, its prevention, detection, trial, punishment, and rehabilitation;

d.  The operation of or contracting for the operation of postadjudication treatment facilities and services for children adjudicated delinquent or found guilty of public offenses or as youthful offenders;

e.  The operation or contracting for the operation, and the encouragement of operation by others, including local governments, volunteer organizations, and the private sector, of programs to serve predelinquent and delinquent youth;

f.  Utilizing outcome-based planning and evaluation of programs to ascertain which programs are most appropriate and effective in promoting the goals of this section;

g.  Conducting research and comparative experiments to find the most effective means of:

   i.  Preventing delinquent behavior;

   ii.  Identifying predelinquent youth;

   iii.  Preventing predelinquent youth from becoming delinquent;

   iv.  Assessing the needs of predelinquent and delinquent youth;

   v.  Providing an effective and efficient program designed to treat and correct the behavior of delinquent youth and youthful offenders;

---

[11] *Id.* at 11-12
[12] See Exh. 1

      vi.  Assessing the success of all programs of the department and those operated on behalf of the department and making recommendations for new programs, improvements in existing programs, or the modification, combination, or elimination of programs as indicated by the assessment and the research; and

    h.  Seeking funding from public and private sources for demonstration projects, normal operation of programs, and alterations of programs.[13]

62. The DJJ is also required to:

    a.  Ensure that youth in state-operated or contracted residential treatment programs have access to an ombudsman to whom they may report program problems or concerns;

    b.  Review all treatment programs, state-operated or contracted, for their quality and effectiveness; and

    c.  Provide mental health services to committed youth according to their needs.[14]

### *The 2017 Audit*

63. In 2016, 16-year-old Gynnya McMillen and her mother got into a fight. The police were called, and Gynnya was taken into custody and booked into a DJJ facility.[15]

64. Gynnya refused to remove her sweatshirt during a screen. This resulted in four DJJ staff members using Aikido restraints and placing her in isolation for nine hours.

65.  During the night, Gynnya suffered a cardiac arrest and died.

66. The Justice and Public Safety Cabinet investigated. The investigation found that DJJ staff had falsified bed checks (among other things) and that adequate staff training and protocols probably would have saved Gynnya's life.

67. In 2017, the DJJ contracted with the Center for Children's Law and Policy ("CCLP") to

---

[13] KRS § 15A.065(1)(a-h)
[14] KRS § 15A.065(4)(a-c).
[15] Exhibit 3; John Cheves, *Audit shows cruel isolation policies, high levels of force prevalent in KY's juvenile jails,* (Jan. 31, 2024)  https://www.kentucky.com/news/politics-government/article284904997.html

"conduct an assessment of conditions in DJJ's juvenile detention facilities."[16]

68. The CCLP is a public interest law and policy organization with nationally recognized expertise in juvenile justice. CCLP has worked with multiple legislative task forces to develop statewide juvenile detention standards in states looking to stem the "numerous lawsuits" arising out of their juvenile detention centers.

69.    The CCLP's 2017 assessment made a number of findings about DJJ's operations, including:

    a.  "An overuse of room confinement (isolation) is jeopardizing the safety and well-being of youth."[17]

    b.  "A court would almost certainly find that the use of these isolation cells, when coupled with the lack of contact that youth have with programming and other youth and adults, is a violation of [the] youth's constitutional rights."[18]

    c.  "Regimented and punitive behavior management systems . . . [drive] the overuse of room confinement" and "unfairly impacts youth with disabilities and medical and mental health problems."[19]

    d.  "A lack of special education services denies youth with disabilities their right to a free and appropriate education."[20]

    e.  "Grievance procedures in the facilities are not structured in a way that encourage youth to report problems."[21]

    f.  "DJJ's detention facilities house many youth with significant mental health needs, but access to mental health professionals is extremely limited."[22]

    g.  "[P]olicies and practices that jeopardize the safety of youth and staff warrant additional training of and oversight by staff at DJJ who are responsible for

---

[16] Exhibit 4; Center for Children's Law and Policy, *Kentucky Department of Juvenile Justice Conditions of Confinement Assessment Summary of Key Findings and Recommendations* (2017); accessible online at https://www.documentcloud.org/documents/4255465-Kentucky-DJJ-Conditions-of-Confinement
[17] *Id.* at 4
[18] *Id.*
[19] *Id.* at 5
[20] *Id.*
[21] *Id.* at 6
[22] *Id.* at 3

monitoring conditions."[23]

70.    The assessment made several concrete recommendations for fixing the problems

within DJJ:

   a.    Limit the use of isolation to situations "where a youth is engaging in behavior that
         is an imminent threat to the safety of the young person or others in the facility,
         and only for as long as the young person represents an imminent threat…"[24]

   b.    Address staffing shortages through salary increases.[25]

   c.    Ensure that there are mental and medical health professionals on-site in each DJJ
         facility.[26]

   d.    "Determine which medicines must <u>never</u> be discontinued abruptly and develop a
         plan to ensure such medications can be continued."[27]

   e.    "Provide routine dental screening and care to youth."[28]

   f.    "Collaborate with local school districts to obtain adequate special education staff
         to meet the needs of youth with disabilities."[29]

   g.    "Ensure that youth receive one full hour of physical recreation per day outside of
         their cells and units."[30]

   h.    "Staff should receive additional training during the Academy, orientation training
         at the facility, and annual training through the in-service training program."[31]

   i.    "Adopt a training model that prioritizes training time on prevention and de-
         escalation strategies as opposed to obtaining physical control of youth."[32]

   j.    Develop training "on the following topics, which are not included in DJJ's
         training academy:"[33]

---

[23] *Id.* at 7
[24] *Id.* at 10
[25] *Id.* at 4
[26] *Id.* at 9
[27] *Id.* at 10
[28] *Id.* at 9
[29] *Id.* at 5
[30] *Id.* at 11
[31] *Id.*
[32] *Id.* at 7
[33] *Id.* at 12

    i.  "Signs of physical, intellectual, and developmental disabilities, the needs of youth with such disabilities, and the ways to work and communicate effectively with youth with those disabilities."

    ii.  "Signs of mental illness and the needs of and ways of working with youth with mental illness."

    iii.  "Gender-specific needs of youth in custody, including special considerations for boys and girls who have experienced trauma, pregnant girls, and health protocols for both boys and girls."

    iv.  "Signs and symptoms of medical emergencies, including acute manifestations of chronic illnesses (e.g., asthma, seizures) and adverse reactions to medication."

  k.  Remove "therapeutic restraints" from DJJ facilities.[34]

  l.  "Remove the magnetic strips over the windows of confinement rooms."[35]

### *The 2023 Audit*

71. On September 11, 2022, a "riot" broke out in the Adair County Youth Detention Center ("Adair"). This did not come as a surprise to many current and former employees, who had been raising concerns about problems at the facility for some time.[36]

72. After several months of hearings in the General Assembly and media coverage, the Kentucky Auditor contracted with a private third-party group called CGL Management Group, LLC, a nationally recognized firm specializing in criminal justice consulting and planning, to

---

[34] *Id.* at 13

[35] *Id.* at 21

[36] *See e.g.,* Exhibit 5; Natalia Martinez, *Violent sexual assault alleged during riot at Adair County's juvenile detention center,* (Nov. 16, 2022); accessible online at https://www.wave3.com/2022/11/16/violent-sexual-assault-alleged-during-riot-adair-countys-juvenile-detention-center/ ; Exhibit 6; John Cheves, *Insiders warned of 'stomach-turning' abuse in KY juvenile facility in months before riot,* (Jan. 23, 2023); accessible online at https://www.kentucky.com/news/politics-government/article271272922.html

investigate the DJJ.[37]

73. After roughly five months, CGL released a 231-page comprehensive report.

74. Among its key findings were:

    a. The DJJ had "not operationalized most of the findings" from the CCLP's 2017 audit.[38]

    b. The DJJ used isolation "for disciplinary, non-behavioral, and housing assignment purposes," in direct contradiction of both the 2017 audit's recommendation and the 1995 consent decree's requirements.[39]

    c. The DJJ used pepper spray at a rate 74 times higher than the federal (adult) prison system.

    d. Facilities do not have "a 24-hour health care presence" and are reliant on "unlicensed health trained correctional staff" to provide some medical care.[40]

    e. "DJJ appears to lack sufficient licensed mental health staff to meet the needs of the youth."[41]

    f. "The provision of education to youth in DJJ is inconsistent, poorly implemented, and lacks oversight."

75. Documents from unannounced inspections gave some more specific context into how

DJJ's policies and practices play out in real time. For example, youth housed at Warren County

Regional Detention Center indicated that:

    a. They were "given isolation for talking without permission;"

    b. Pepper sprayed after being placed in cuffs;

---

[37] Exhibit 7; Auditor of Public Accounts, Press Room, *Auditor Ball Releases Performance Review of the Department of Juvenile Justice* (Jan. 31 2024); accessible online at https://www.auditor.ky.gov/PressRoom/Pages/2024-DJJ-Performance-Review.aspx
[38] CGL Management Group, LLC, *Commonwealth of Kentucky Department of Juvenile Justice: Juvenile Justice Performance Assessment of Facilities,* (Final Report, January 29, 2024); https://www.auditor.ky.gov/Auditreports/Miscellaneous/KentuckyDJJPerformanceReview.pdf
[39] *Id.* at 20-32
[40] *Id.* at 47
[41] *Id.* at 5; 81

   c.   They were "threatened with [pepper spray] a lot;"

   d.   Saw staff laughing at a youth who was threatening to commit suicide and telling the youth "he wouldn't do it;"

   e.   There was no counseling or group therapy; and

   f.   Staff threatened a suicidal youth with pepper spray. [42]

76. This information was obtained from just one unannounced inspection at one facility.

### *Adair County Youth Detention Center*

77. Adair is charged with the care, custody, and supervision of incarcerated youth. The Detention Center is made a Defendant to this action for the purpose of declaratory and injunctive relief only. The Adair County Youth Detention Center ("Adair") is one of eight juvenile detention centers operated by the Department of Juvenile Justice.

78.  Adair houses pre- and post-conviction youthful offenders, as well as non-offenders in the custody of the Cabinet for Health and Family Services.

79. Adair is, and has been, chronically understaffed, frequently operating with only 5 employees while housing approximately 40 children.

80. Adair regularly holds children in lockdown for days or weeks at a time.

81. While locked down, children in Adair would eat, sleep, and defecate in their cells.

82. Staff at Adair covered the windows to some cells to prevent children from looking outside their cell.

83. Staff at Adair would withhold prescribed medications from children as a form of punishment.

84. Staff at Adair restricted children's access to showers and other basic hygiene needs.

---

[42] *Id.* at 117

85. Children in Adair were frequently not provided any educational instruction.

86. Staff at Adair frequently used excessive and unnecessary force or restraint holds.

87. Upon information and belief, Trazodone was regularly used to sedate children in Adair.

88. Adair's intake area would regularly go unstaffed for hours.

89. Adair staff restricted children's access to toilet paper.

90. Defendant Burton and other staff regularly falsified incident reports to conceal the suffering inflicted on children in Adair.

91. Defendant Burton and other staff restricted children's access to medical providers.

92. Defendant Burton lied to medical staff about the conditions of children in the facility.

93. Upon information and belief, plumbing in Adair was not maintained or, at times, intentionally cut off.

94. Upon information and belief, male staff regularly conducted cell checks on girls detained without clothing.

95. Medical providers reported the abuse and neglect occurring at Adair to officials with the Department of Juvenile Justice, including Defendants Reed, Scott, Sweatt, and Kazee.

96. On at least one occasion in the summer of 2022, Defendant Reed visited Adair.

97. During her visit, medical staff asked Defendant Reed to observe the conditions in the isolation cells.

98. Defendant Reed did not visit the isolation cells because she was too busy.

### Campbell Regional Juvenile Detention Center

99. Defendant Campbell Regional Juvenile Detention Center ("Campbell") is charged with the care, custody, and supervision of incarcerated youth. Campbell is one of eight juvenile detention centers operated by the Department of Juvenile Justice. Campbell is made a Defendant to this

action for the purpose of declaratory and injunctive relief only.

100.     Upon information and belief, Campbell houses pre- and post-conviction youthful offenders as well as non-offenders in the custody of the Cabinet for Health and Family Services.

101.     Campbell is, and has been, chronically understaffed.

102.     Campbell houses boys and girls aged 11-18.

103.     Campbell regularly held children in isolated cells for days or weeks at a time.

104.     Campbell held children in isolated cells for the entire month of May 2023.

105.     While locked down, children in Campbell would eat, sleep, and defecate in their cells.

106.     Girls in Campbell were subjected to strip searches by male employees.

107.     Several employees in Campbell were reported to have engaged in sex acts with children.

108.     One employee was accused of molesting three boys in the facility and showing children pornography.

109.     Another employee was reported for pinning a girl down and rubbing his erect penis on her.

110.     In April, 2023 Campbell's Superintendent and DJJ employees, including Reed and Kazee, received reports that a staff member was taking girls to unmonitored locations and sexually abusing them.

111.     The DJJ allowed that staff member to continue to interact with and sexually assault girls in the facility until May 31, 2023.

112.     Staff at Campbell frequently used excessive and unnecessary force or restraint holds.

113.    Upon information and belief, Campbell regularly used Trazodone to sedate children.

114.    Suspected suicide attempts by girls in Campbell were met with physical violence, cross-gender stripping, and isolation without clothing.

115.    Upon information and belief, staff in Campbell frequently failed to obtain medical care following a suicide attempt.

116.    Children in Campbell regularly did not receive their prescribed medications.

117.    Campbell restricted access to physical and mental healthcare.

118.    Staff in Campbell received no training on the use of pepper spray.

119.    Children in Campbell have been pepper sprayed while they were inside their cells.

120.    Upon information and belief, no corrective action was taken against staff for misusing pepper spray.

121.    Medical providers reported the abuse and neglect occurring at Campbell to officials with the Department of Juvenile Justice and the Cabinet for Health and Family Services.

### Fayette Regional Juvenile Detention Center

122.    Fayette Regional Juvenile Detention Center ("Fayette") is charged with the care, custody, and supervision of incarcerated youth. Fayette is made a Defendant to this action for the purpose of declaratory and injunctive relief only. Fayette is one of eight juvenile detention centers operated by the Department of Juvenile Justice.

123.    Fayette houses pre- and post-conviction youthful offenders.

124.    Fayette is, and has been, chronically understaffed.

125.    Fayette regularly held children in solitary cells for weeks or months at a time.

126.      While locked down, children in Fayette would eat, sleep, and defecate in their cells.

127.      Staff at Fayette restricted children's access to showers and other basic hygiene needs.

128.      Upon information and belief, Fayette regularly used Trazodone to sedate children in its custody.

129.      Children in Fayette were frequently not provided any educational instruction.

130.      Staff at Fayette frequently used excessive and unnecessary force or restraint holds.

### Plaintiff Jamiahia Kennedy

131.      Plaintiff Jamiahia Kennedy was confined in Adair from approximately August 30, 2022 to December 13, 2022.

132.      Kennedy suffers from serious mental health conditions, including PTSD.

133.      While in Adair, Kennedy received a prescription for Trazodone.

134.      During her four months in Adair, Kennedy was kept in solitary cell.

135.      During her four months at the Detention Center, Kennedy was provided access to a shower approximately fifteen times.

136.      Kennedy resorted to using her bra to wash her body.

137.      On one occasion Kennedy was allowed to shower, she was accompanied by two male police officers.

138.      The officers turned off the shower before Kennedy could wash the soap off her body. When Kennedy objected, officers entered the shower, pinned her down, and threatened to tase her.

139.      Following a suicide attempt, Kennedy was moved to a padded cell, where male

employees cut off her clothing.

140.    Kennedy was held in the padded cell for approximately 2 months.

141.    The padded cell did not have a working toilet, nor did it have a bed.

142.    Because the toilet did not work, urine and excrement overflowed into the cell.

143.    Although initially provided with a suicide smock, Defendant Burton later removed the smock and did not provide Kennedy with any clothing or shower access for approximately twelve days.

144.    On several occasions, Kennedy asked Burton for feminine hygiene products, and Burton refused.

145.    While in Adair, Kennedy did not receive any educational instruction.

146.    Although Kennedy has been diagnosed with serious mental health conditions, while in Adair, Kennedy did not receive any mental health treatment.

147.    In November 2022, Adair staff withheld prescribed medications from Kennedy and other detainees as collective punishment.

148.    On December 13, 2023, Kennedy was transferred to Campbell.

149.    Kennedy was held in a solitary cell from January to August 2023.

150.    While in Campbell, she was strip searched by two male employees.

151.    While in Campbell, Kennedy did not regularly receive her prescribed medications.

152.    On one occasion, a staff member punched Kennedy in the face.

153.    On another occasion, a male staff member entered her cell while she was asleep in a suicide smock and lifted her leg to expose her genitals.

154.    On another occasion, a male staff member told Kennedy that she was too ugly to

rape.

155.    Kennedy was pepper sprayed twice by Campbell staff.

156.    Following a suicide attempt, then-Superintendent Craig McWhorter told Kennedy he hoped her next attempt was successful.

### Plaintiff Willow Neal

157.    Plaintiff Willow Neal entered the Cabinet's foster care system at age 9.

158.    Like Kennedy, Neal suffers from serious mental health conditions, including PTSD.

159.    She was confined to Adair from November 10 to December 15, 2022.

160.    At the time of her detention, she was 17 years old and seven months pregnant.

161.    Medical providers advised Defendant Burton and other staff that Neal should not be locked down in an isolation cell.

162.    Neal was held in an isolation cell throughout her time at the Detention Center.

163.    Neal's cell was infested with insects.

164.    Neal made several requests for cleaning supplies to clean her cell, all of which were denied.

165.    Over the course of her detention, Neal received approximately twelve showers.

166.    Over the course of her detention, Neal was let out of her cell to take a walk approximately five times.

167.    Instead of educational instruction, Neal received workbooks to complete on her own.

168.    Neal did not receive any school credit for completing the workbooks.

169.        While Neal was in the Detention Center, she did not receive any mental health care, nor did she receive any prescribed medications.

170.        While in Adair, her Cabinet case worker never contacted her.

171.        On December 14, 2022, Neal was transferred to Campbell.


### Plaintiff Chanchiz Brown

172.        Brown was 15 years old when he was sent to Fayette in September 2021.

173.        Brown spent approximately one year in Fayette.

174.        Brown was kept on lock down for the entirety of his stay in Fayette.

175.        While in Fayette, Brown was prescribed Trazodone.

176.        Fayette did not provide classroom instruction to Brown but did furnish a Chromebook so he could work independently in his cell.

177.        Brown was sent to Adair in approximately September 2022 and was held there until December 2023.

178.        Adair restricted Brown's access to his family to one phone call per week.

179.        In November 2022, other detainees obtained keys to the facility and unlocked Brown's and other detainees' cells.

180.        Brown immediately went to the phone and called his mother, who in turn, called 911.

181.        Brown was punished for making the call.

182.        He was not permitted to shower for 8 days.

183.        As punishment, Adair staff withheld his allergy medications for 14 days.

184.        For an unknown period, every meal he received was a bologna-like cold cut

sandwich.

185.    During his incarceration at Adair, Brown repeatedly asked to see a dentist for increasingly worsening tooth pain.

186.    Over his entire incarceration in DJJ facilities, Brown never saw a dentist.

### Plaintiff D.B.

187.    Plaintiff D.B. was 15 years old when he was sent to Adair in November 2022.

188.    Like Brown, D.B.'s access to family members was restricted. He was unable to talk to his mother for approximately one month after arriving in Adair.

189.    While in Adair, D.B. was prescribed Trazadone.

190.    Brown witnessed Adair staff restrain other detainees with instructions not to let go "until he screams."

191.    Brown witnessed Adair staff visibly intoxicated while on duty.

192.    Brown was not permitted to shower for two weeks while locked down in November 2022.

193.    On Christmas Day, D.B. took too much time in the shower and was forced out of the shower with his shirt off and pants down, handcuffed, threatened with a taser, and taken to an isolation cell where he spent the next five days.

194.    For two weeks, he received 2 meals per day, consisting of a cold cut sandwich, chips, and a juice box.

195.    Adair staff regularly withheld food and drink as punishment.

196.    Adair staff did not provide D.B. with his asthma and allergy medications.

197.    D.B. did not receive any mental healthcare while in Adair.

198.    D.B. was pepper sprayed by staff during a minor altercation with another detainee.

199.    D.B. is on probation and subject to re-institutionalization by the DJJ.

### *Plaintiff C.C.*

200.    C.C. was 14 when he was taken to Adair in December 2023.

201.    C.C. is on an Individualized Education Plan and part of Jefferson County Public School's Exceptional Child Education (ECE) program.

202.    C.C. spent 3 weeks in a solitary cell in Adair's intake area.

203.    C.C. was moved to the floor on December 22.

204.    On December 25, C.C. was attacked by two 17-year-old detainees.

205.    Following the assault, C.C. told staff that he felt light-headed and nauseous.

206.    Staff told C.C. he would have to wait until the next day to see a nurse.

207.    On December 26, a nurse ordered an x-ray and gave C.C. Tylenol.

208.    On the evening of December 29, Adair staff took C.C. to a local hospital for an x-ray. The x-ray revealed that C.C. had a broken jaw.

209.    The local hospital transferred C.C. to Kosair Children's Hospital, where he was admitted and underwent a mandibular reconstruction surgery.

210.    Adair did not accommodate C.C.'s IEP, instead he was provided with worksheets to complete on his own.

211.    C.C. remains in the custody of DJJ.

### *Other Members of the Putative Class*

212.    The Plaintiffs' treatment is typical for all youth housed within DJJ.

213.    For example, in the summer of 2022, medical staff reported increasing alarm over the treatment of a girl within Adair whose mental and physical health rapidly deteriorated while in

an isolation cell without running water and frequently without lighting.

214.    This girl was physically assaulted, denied medical treatment, and employees frequently mocked her in person and on social media.

215.    Another child was held in an isolation cell with the door's window covered and a Spanish version of "Baby Shark" playing on a loop.

216.    Another child received a punishment of 24-hours' isolation but was arbitrarily held in isolation for several days.

217.    Kennedy and Neal both observed a girl who spent days soaked in menstrual blood while Detention Center staff told her she was "nasty" and "smelled like fish."

## LEGAL CLAIMS

### COUNT I
### Constitutional Deprivations
### *42 U.S.C. §1983*

218.    Defendants were acting under the color of state law when they detained children at the Detention Centers.

219.    Defendants deprived Plaintiffs of their rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

220.    The abuses to which Plaintiffs and the class were subjected, as described above, was the result of Defendants' enactment or promulgation of inadequate policies and their failure train and supervise employees to maintain the safety of children in their custody.

221.    Defendants are final policymakers and decisionmakers for the Detention Center and had oversight responsibility for ensuring that:

a)    Children are not exposed to a serious and excessive risk to their health or safety;

b)      The staff are trained to prevent, detect, and respond to abuse;

c)      Children can safely report abuse;

d)      Officers, employees, and contractors are adequately trained and supervised;

e)      The facility is adequately staffed with resources necessary to protect children from abuse;

f)      Children are provided with appropriate educational instruction;

g)      Children are provided with necessary medical and mental healthcare;

h)      Children are provided safe and sanitary living quarters;

i)      Children are provided regular access to showers and basic personal hygiene needs;

j)      Children are provided with daily access to recreational activity;

k)      Children are free from cruel and unusual punishment and excessive force.

222.    Defendants knew that their policies and practices created conditions that were substantially likely to result in unconstitutional conditions of confinement within DJJ facilities.

223.    Despite this knowledge, Defendants chose to continue its unconstitutional practices, thereby causing serious harm to Plaintiffs and the Class.

224.    Defendants' deliberate indifference and reckless disregard of the rights of the Detention Centers' vulnerable residents, inadequate staffing and training practices, and refusal to promulgate and enforce appropriate policies, customs, and practices directly led to the violation of Plaintiffs' and the Class's constitutional rights.

225.    As a result of the foregoing failures, and the other institutional failures identified in this Complaint, the inadequacy of Defendants' policies, customs, practices, and procedures were so likely to result in the violation of constitutional rights that Defendants can reasonably be said to have been deliberately indifferent to a serious and excessive risk to the health and safety of

Plaintiffs.

226.     As a direct and proximate result of the aforementioned conduct, Plaintiffs and others similarly situated suffered physical harm, economic loss through the loss of educational opportunities, emotional distress, and mental anguish.

## COUNT II
## Negligence

227.     Pursuant to KRS § 605.100, Defendants had a ministerial duty to provide children in the Detention Center a program designed and operated in such a manner as to rehabilitate, train, develop, and educate the children.

228.     Defendants failed to train, develop, and educate Plaintiffs and members of the Class.

229.     Pursuant to KRS § 15A.065, Defendants had a ministerial duty to provide children in the Detention Center with mental health services and access to an ombudsman to whom they may report concerns.

230.     Defendants failed to provide mental health services and access to an ombudsman to Plaintiffs and the Class.

231.     Pursuant to KRS § 15A.067, Defendants had a ministerial duty to provide children in the Detention Center with an appropriate education and, upon their release, forward educational records to the district in which the student resides.

232.     Defendants failed to provide appropriate education and failed to forward educational records of the Plaintiffs and Class.

233.     Even where Defendants established policies, the policies were facially inadequate or knowingly disregarded.

234.     Defendants breached their above duties to children detained in the Detention

Centers.

235.     As a result of Defendants' breach, Plaintiffs and the class suffered physical harm,

emotional distress, and mental anguish.

**COUNT III**
**Disability Discrimination**
*42 U.S.C. § 12132*

236.     The Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., and

specifically 42 U.S.C. § 12131-12134, prohibits discrimination in public services on the basis of

disability.

237.     42 U.S.C. § 12131 provides that "no qualified individual with a disability shall,

by reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any such

entity."

238.     The ADA defines a "public entity" to include any state or local government or

any department, agency, special purpose district, or other instrumentality of a State or local

government.[43]

239.     At all relevant times, Plaintiffs were persons with a disability that substantially

limits one or more of their major life activities, had records of their disabilities, or were regarded

as having a disability by Defendants.

240.     Defendants were aware of Plaintiffs' disabilities.

241.     Plaintiffs were "qualified individual[s] with disabilities" within the meaning of

the ADA.[44]

---

[43] 42 U.S.C. § 12131(1)
[44] 42 U.S.C. § 12131(2)

242.     Plaintiffs were qualified to participate in the services, programs, activities, and benefits provided within the meaning of Title II of the ADA.

243.     Defendants discriminated against Plaintiffs on the basis of their disabilities and failed to reasonably accommodate their disabilities despite knowing that they suffered from a number of mental health disabilities.

244.     These actions and inactions violated clearly established law under Title II of the ADA and its implementing regulations.

245.     While Plaintiffs were locked in solitary confinement, Defendants Burton, Rakes, Milburn, Caskey, and/or others excluded them from participating in and denied them the benefits of Defendants' educational and rehabilitative programs, service, and activities by reason of their disabilities.

246.     Solitary confinement has a disproportionate burden on Plaintiffs by reason of their disabilities that results in further solitary confinement and further denial of educational and rehabilitative programs, service, and activities.

247.     Defendants failed to make reasonable modifications to their policies, practices, and procedures even though such modifications are necessary to avoid discriminating under the ADA.

248.     Defendants adopted and implemented policies and practices with regard to solitary confinement that had a disparate impact on children with disabilities.

249.     Defendants failed to provide Plaintiffs with the special education and related services they require, by reason of their disabilities, to equally access education while at the Detention Centers.

250.     Defendants had no legitimate basis for violating Plaintiffs' rights, and Defendants

engaged in these actions and inactions intentionally, willfully, and wantonly.

251.     Because Defendants' conduct also constitutes a Fourteenth Amendment violation, the Defendants are not entitled to sovereign immunity.

252.     Defendants' actions and inactions were the proximate and legal cause of Plaintiffs' injuries.

253.     Defendants failed to properly train, supervise and/or discipline their employees regarding the proper treatment of, and accommodations for, individuals with disabilities and, in particular, mental disabilities.

254.     This inadequate training, supervision, and/or discipline results from a conscious or deliberate choice to follow a course of action from among various alternatives available to the Defendants.

255.     Plaintiffs have suffered damages by Defendant's unlawful conduct under the ADA, and are entitled to compensatory damages, including damages for emotional pain, suffering, and mental anguish.

### COUNT IV
### Section 504, Rehabilitation Act
### *29 U.S.C. §794*

256.     Section 504 prohibits any qualified individual with a disability from being excluded from the participation in, denied the benefits of, or to be subjected to discrimination under any program or activity receiving Federal financial assistance.[45]

257.     Defendants DJJ, the Cabinet, and CHFS are public entities receiving federal funds and are therefore subject to Section 504.[46]

---

[45] 29 U.S.C. § 794(a)
[46] 29 U.S.C. § 794(a), (b)

258.     Plaintiffs are each qualified individuals with disabilities, as detailed herein.

259.     Plaintiffs' disabilities substantially limit one or more life activities, such as learning, concentrating, thinking, communicating, sleeping, and/or walking.

260.     Defendants regarded each Plaintiff as having disabilities.

261.     Plaintiffs were intentionally excluded from participation in and denied the benefits of Defendants' services, programs, or activities. Plaintiffs were denied participation in educational programs, therapeutic programs, rehabilitative programs, and other services. The exclusions were based solely on their respective disabilities.

262.     Defendants discriminated against Plaintiffs on the basis of their disabilities that drove their disruptive or problematic behaviors and prevented them from participating in programming like all other non-disabled children.

263.     Defendants adopted and implemented policies and practices with regard to solitary confinement that had a disparate impact on children with disabilities.

264.     Defendants failed to provide Plaintiffs with the special education and related services they require, by reason of their disabilities, to equally access education in the Detention Centers.

265.     Defendants had no legitimate basis for violating Plaintiffs' rights, and Defendants engaged in these actions and inactions intentionally, willfully, and wantonly.

266.     Because Defendants' conduct also constitutes a Fourteenth Amendment violation, Defendants are not entitled to sovereign immunity.

267.     Defendants' actions and inactions were the proximate and legal cause of Plaintiffs' injuries.

268.     Defendants failed to properly train, supervise and/or discipline their employees

regarding the proper treatment of, and accommodations for, individuals with disabilities and, in particular, mental disabilities.

269.    This inadequate training, supervision, and/or discipline results from a conscious or deliberate choice to follow a course of action from among various alternatives available.

270.    Plaintiffs have suffered damages by Defendants' unlawful conduct under Section 504 and are entitled to compensatory damages, as permitted by law.

**WHEREFORE,** Plaintiffs and the class they represent request:

A.    That this action proceed as a class action under Fed. R. Civ. P. 23(b)(1-3);

B.    A trial by jury;

C.    An award of actual and punitive damages to Plaintiffs and all members of the class;

D.    A declaratory judgment deeming unconstitutional the conditions of confinement for youth at the Detention Centers, and permanently enjoining Defendants from operating the Detention Centers in an unconstitutional manner; and

E.    An award of attorney fees, costs and expenses incurred in this action, and interest on all sums awarded at the maximum rate permitted by law, including but not limited to 42 U.S.C. §1988 and KRS § 412.070; and

F.    Any and all other relief to which they may be entitled.


Respectfully submitted,


and

*/s/John S. Friend*
JOHN FRIEND
ERIN STEMLE

ALEX R. WHITE, PLLC
904 Minoma Avenue
Louisville, KY  40217
friend@arwhitelaw.com
erin@arwhitelaw.com
(502) 882-7552

/s/ *Laura E. Landenwich (by JSF with permission)*
LAURA E. LANDENWICH, #92109
ADAMS LANDENWICH LAY, PLLC
517 West Ormsby Avenue
Louisville, KY  40203
laura@justiceky.com
(502) 561-0085

*Counsel for Plaintiffs*